Jeffrey W. Dulberg (CA Bar No. 181200)
John W. Lucas (State Bar No. 271038)
Jeffrey P. Nolan (CA Bar No. 158923)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile: 310-201-0760
jdulberg@pszjlaw.com
jlucas@pszjlaw.com
jnolan@pszjlaw.com

Attorneys for Plaintiff, Bradley D. Sharp,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 23-01990-SK |
| LESLIE KLEIN, | Chapter 11 |
| Debtor. | Adv No. 23-01167-SK |

| | |
|---|---|
| BRADLEY D. SHARP, Chapter 7 Trustee, | **THIRD DECLARATION OF JEFFREY P. NOLAN IN SUPPORT OF PLAINTIFF'S REQUEST TO STRIKE PORTIONS OF THE (1) AMENDED SECOND DECLARATION OF KENNETH KLEIN, AND (2) SECOND DECLARATION OF SHOSHANA KLEIN, IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| KENNETH KLEIN aka KENNETH KOLEV KLEIN aka KENNETH K. KLEIN aka KEN KLEIN, an individual; SHOSHANA SHIFRA KLEIN, aka SHOSHANA KLEIN, aka SHOSHANA S. KLEIN, an individual, | |
| Defendant. | Hearing: |

Date:    February 5, 2025
Time:    9:00 a.m.
Place:   Edward R. Roybal Federal Building
         and Courthouse
         255 E. Temple Street, Courtroom 1575
         Los Angeles, CA 90012

Judge:  Honorable Sandra R. Klein

I, Jeffrey P. Nolan, declare as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4905-6738-5613.3 78512.001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.     I am an attorney with Pachulski Stang Ziehl & Jones LLP, attorneys of record for Plaintiff, Bradley D. Sharp, Chapter 7 Trustee, I have personal knowledge of the facts set forth herein.  If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration in support of Plaintiff's Objection and Request to Strike the Second Amended Declaration of Kenneth Klein, and Second Declaration of Shoshana Klein untimely filed in opposition to Plaintiff's Motion For Summary Judgment [Dkt. No. 47] or alternatively in support of Defendants' Cross Motion For Summary Judgment. [Dkt. No. 65].

2.     I am familiar with the litigation in this adversary, the pleadings, the discovery propounded.  The deposition transcripts identified below are true and correct copies of the depositions taken by the undersigned, the transcripts thereof, and received as maintained as a normal business practice of this firm and included in our records.

3.     Attached hereto as **Exhibit A** is a true and correct copy of the marked and highlighted excerpts of the pertinent pages to the Deposition Transcript of Shoshana Shrifa Klein taken on May 7, 2024 in the adversary case.

4.     Attached hereto as **Exhibit B** is a true and correct copy of the marked and highlighted excerpts of the pertinent pages to the Deposition Transcript of Kenneth Klein taken on May 6, 2024 in the adversary case.

I declare under penalty of perjury under Federal law and the law of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed on this 15th day of January, 2025, at Los Angeles, California.

Jeffrey P. Nolan

# EXHIBIT A

Shoshana Klein                                                    In re Leslie Klein

1

2                     UNITED STATES BANKRUPTCY COURT

3                    CENTRAL DISTRICT OF CALIFORNIA

4                        LOS ANGELES DIVISION

5

6

7

       In re LESLIE KLEIN,            )   Case No.:
8                                     )   23-01990-SK
           Debtor.                    )
9      ───────────────────────────    )
                                      )
10     BRADLEY D. SHARP, Chapter 11   )
       Trustee,                       )
11                                    )
           Plaintiff,                 )
12                                    )
                    v.                )
13     KENNETH KLEIN aka KENNETH KOLEV )
       KLEIN aka KENNETH K. KLEIN aka )
14     KEN KLEIN, an individual;      )
       SHOSHANA SHIFRA KLEIN aka      )
15     SHOSHANA KLEIN aka SHOSHANA S. )
       KLEIN, an individual,          )
16                                    )
           Defendants.                )
17                                    )

18     ─────────────────────────────────────────────

                DEPOSITION OF SHOSHANA KLEIN
19     ─────────────────────────────────────────────

20                  (Taken by Plaintiff.)

                  May 7, 2024, 10:04 a.m.
21

22

23

24     Job No.: 10139829
       Reported By:
25     SUSAN GALLAGHER, CA CSR 14498, CVR-CM
       Transcript produced by computer-aided transcription

Shoshana Klein                                                    In re Leslie Klein

```
 1

 2                              APPEARANCES

 3

     For the Plaintiff:
 4

                    JEFFREY P. NOLAN, ESQ.
 5                  PACHULSKI STANG ZIEHL & JONES LLP
                    10100 Santa Monica Boulevard, 13th Floor
 6                  Los Angeles, California  90067
                    (310) 277-6910
 7                  jnolan@pszjlawcom

 8   For the Defendants:

 9                  SIMON ARON, ESQ.
                    WOLF RIFKIN SHAPIRO SCHULMAN & RABKIN LLP
10                  11400 West Olympic Boulevard, 9th Floor
                    Los Angeles, California  90064
11                  (310) 478-4100
                    saron@wrslawyers.com
12
     Also present:  Kenneth Klein
13                  Nicholas Troszak (appearing telephonically)

14

15             DEPOSITION OF SHOSHANA KLEIN, a witness called before

16   SUSAN GALLAGHER, CA CSR 14498, CVR-CM, taken by Plaintiff on

17   Tuesday the 7th of May, 2024, commencing at 10:04 a.m.

18

19

20

21

22

23

24

25
```

1          MR. ARON:  That's what I would say.

2          THE WITNESS:  It is.

3   BY MR. NOLAN:

4      Q.   Was Mr. -- was Leslie Klein at all involved in helping

5   you settle into Los Angeles?

6      A.   No.

7      Q.   Did he help you set up bank accounts?

8      A.   I don't recall.

9      Q.   Did he get you a car?

10     A.   I don't know.  I'm unaware.

11     Q.   You're not aware?  Are you aware now whether or not he

12  did any of that?

13     A.   No, he didn't do that.

14     Q.   How about the Poinsettia property house, are you aware

15  of who purchased the Poinsettia property house?

16     A.   I know my parents were involved in it and paid towards

17  it.

18     Q.   Do you know if -- do you know if the Poinsettia

19  property was leased?

20     A.   I don't know.

21     Q.   So is it -- is it possible the Poinsettia property was

22  leased by the -- strike that.

23          What was your understanding of what your parents'

24  involvement was with the Poinsettia property?

25     A.   They were involved financially.

Shoshana Klein                                                    In re Leslie Klein

```
 1        Q.    And what does that mean?

 2        A.    They gave towards it.

 3        Q.    Did your parents purchase the property?

 4        A.    I don't know.

 5        Q.    Do you know how much money your parents paid?

 6        A.    I don't.

 7        Q.    Do you know who your parents paid money to?

 8        A.    I don't.

 9        Q.    Was there an escrow for the Poinsettia property?

10        A.    I don't know.

11        Q.    And when I say "escrow," I'm saying before you moved

12   into it in 1998, was there an escrow that you were involved with

13   for the purchase of the Poinsettia property?

14        A.    I don't know.

15        Q.    Do you have any recollection as you sit here today of

16   executing any documents in escrow?

17        A.    I don't.

18        Q.    Do you have any knowledge as to any amounts that

19   Leslie or Erica Klein contributed to the Poinsettia property?

20        A.    I don't.

21        Q.    I'm going to show you an exhibit.  This is Exhibit 1.

22              (Exhibit 1 marked for identification.)

23   BY MR. NOLAN:

24        Q.    So you can pick that up.  I'm going to ask you a

25   question after you look at it.
```

```
1          A.   I don't recall.

2          Q.   Okay.  I'm going to show you another document.  It's

3   mark as Exhibit 3 -- I mean 2.  Sorry.

4               (Exhibit 2 marked for identification.)

5   BY MR. NOLAN:

6          Q.   For the record -- go ahead and read it.  Ms. Klein,

7   I'm just going to identify it for the record.

8               MR. NOLAN:  Exhibit 2 is a one-page -- two-page

9   document that's marked Defendants' 0004-005, and at the top it

10  says "Statement from Leah Stern."

11  BY MR. NOLAN:

12         Q.   And whenever you're ready, just let me know.

13         A.   Yeah.

14         Q.   Okay.  Have you seen Exhibit 2 before today?

15         A.   Yes.

16         Q.   When did you see it before today?

17         A.   I don't recall.

18         Q.   Did you review any documents before your deposition

19  today?

20         A.   I don't recall.

21         Q.   You don't recall if you looked at any documents in

22  preparation for your deposition today?

23         A.   Before today?

24         Q.   Before today?

25         A.   No, I don't recall.
```

Shoshana Klein                                                              In re Leslie Klein

1      Q.   When did you learn that you were going to be deposed

2  in this case?

3      A.   Two weeks ago.

4      Q.   Two weeks ago.

5           And in preparation for your deposition today, did you

6  look at any documents?

7      A.   I don't recall.

8      Q.   Okay.  Did you talk to anyone other than your lawyer

9  about your deposition today?

10     A.   No, I don't recall.

11     Q.   You don't recall if you talked to anyone about your

12  deposition --

13     A.   Besides my husband and my --

14          MR. ARON:  Other than your husband or your lawyer.

15          THE WITNESS:  My sibling.

16  BY MR. NOLAN:

17     Q.   All right.  And who's that?

18     A.   What's his name?

19     Q.   Yeah.

20     A.   Eli.

21     Q.   Sorry.  Rude I didn't ask.  How many siblings do you

22  have?

23     A.   Six.

24     Q.   Okay.  And where do they -- can you spell his name?

25     A.   E-L-I.

1  Q.   And where does Eli live?

2  A.   Toronto.

3  Q.   Okay.  Anyone else besides Eli that you talked to?

4  A.   No.

5  Q.   And did you talk to your husband about his deposition

6  testimony yesterday?

7       MR. ARON:  This is a yes-or-no answer.

8       THE WITNESS:  Yes.

9  BY MR. NOLAN:

10  Q.   Did you talk to your husband at all about your

11  deposition that was going to be taken today?

12       MR. ARON:  Yes-or-no answer.

13       THE WITNESS:  No.

14       MR. NOLAN:  And, Counsel, can I understand why you're

15  restricting my questions about her conversations with her

16  husband?

17       MR. ARON:  Because of the marital privilege.

18       MR. NOLAN:  Okay.  So you're asserting the marital

19  privilege.

20       MR. ARON:  If it wasn't obvious, yes, we're asserting

21  both the attorney-client to the extent that she had

22  conversations with counsel and to the extent she had

23  conversations with her husband, marital privilege which applies.

24       MR. NOLAN:  Okay.  And I'm just going to be overly

25  self-explanatory here.  You're instructing the witness not to

1    answer based on those privileges?

2         MR. ARON:  Based on all those privileges, she's

3    instructed not to answer, and I apologize for not putting that

4    on the record directly.

5    BY MR. NOLAN:

6    Q.    Do any of your siblings live in L.A.?

7    A.    No.

8    Q.    Do they all live in Canada?

9    A.    No.

10   Q.    Do any live in the US?

11   A.    Yes.

12   Q.    And where in the US do they live?

13   A.    Chicago.  Muncie, New York.

14   Q.    Muncie, New York?

15   A.    Yeah.

16   Q.    All right.  Anywhere else?

17   A.    New Jersey.

18   Q.    And which sibling lives in Muncie, New York?

19   A.    What's their name?

20   Q.    Yeah.

21   A.    N-E-C-H-M-A-A.

22   Q.    How do you pronounce that?

23   A.    Nechmaa.

24        MR. ARON:  We're just going to include an objection to

25   this line of questioning, again on the basis of relevance.

Shoshana Klein                                              In re Leslie Klein

1     Q.   Do you recall having any conversation with Leslie

2   Klein before you moved into the 306 North Highland property?

3     A.   I don't recall.

4     Q.   Do you recall having any conversation with Erica Klein

5   before you moved into the 306 North Highland property?

6     A.   I don't recall.

7     Q.   Do you recall having any conversation with your

8   parents before you moved into the 306 North Highland property?

9     A.   I don't recall.

10    Q.   Did you talk to your parents about the issue of

11  wanting to move into a bigger house?

12    A.   I don't recall.

13    Q.   Do you recall how much the Highland property was worth

14  would you moved in in or around 2010?

15    A.   I don't recall.

16    Q.   Do you know if it was over a million?

17    A.   I don't recall.

18    Q.   When you were living in the Poinsettia property, were

19  you paying attention at all to what the real estate values were?

20    A.   I don't recall.

21    Q.   So it's possible you were?

22    A.   I don't remember.  I don't think so.

23    Q.   Is that something that you -- you know, everybody has

24  their own interests.  Do you pay attention to what real estate

25  prices -- whether they appreciate or depreciate?

Shoshana Klein                                                In re Leslie Klein

```
 1   grant deed on the Poinsettia property when you first moved to
 2   L.A.?
 3        A.   I don't recall.
 4        Q.   Do you have any recollection as you sit here today of
 5   ever executing a grant deed?
 6        A.   I don't.
 7             MR. ARON:  It's asked and answered.
 8             But it's okay.
 9   BY MR. NOLAN:
10        Q.   And when I asked you about executing a grant deed, I'm
11   referring specifically to the Poinsettia property.
12        A.   I don't recall.
13        Q.   Do you recall ever executing any type of a contract
14   with regard to the Poinsettia property?
15        A.   I don't recall.
16        Q.   Did Leslie Klein ever tell you he intended you to be
17   the owner of the Poinsettia property?
18        A.   I don't recall.
19        Q.   Did Leslie Klein ever tell you that he intended you to
20   be the beneficiary owner of the Poinsettia property?
21        A.   I don't recall.
22        Q.   When you moved into the Poinsettia property, did you
23   believe it was yours?
24        A.   I did.
25        Q.   Did you believe it was yours personally, or was it
```

Shoshana Klein                                                    In re Leslie Klein

 1   your husband's property?

 2        A.   Joint.

 3        Q.   So your belief is that it was both --

 4        A.   I believed.

 5        Q.   You believed it was both your properties?

 6        A.   Yes.

 7        Q.   Did your husband ever tell you that the Poinsettia

 8   property was his property?

 9        A.   No.

10        Q.   He never mentioned to you that he wanted to hold title

11   to the property in his -- as separate property?

12        A.   I don't recall.

13        Q.   Do you understand what I mean when I say "separate

14   property"?

15        A.   Separate from me.

16        Q.   Yes.

17        A.   I don't recall.

18        Q.   Because we're in a community property state where

19   husbands and wives share property.  Did you ever have that

20   discussion with him about keeping his property separate from

21   your property?

22        A.   I don't recall.

23        Q.   So you don't recall any conversation with your husband

24   in 1998 about keeping his property that he had or owned before

25   he married you separate?

Shoshana Klein                                                    In re Leslie Klein

1      Q.   Do you recall what the costs were?

2      A.   I don't recall.

3      Q.   Did you make any changes to the yard, anything of that

4   nature?

5      A.   I don't recall.

6      Q.   Do you recall ever taking any -- any loans out where

7   you used the house as security?

8      A.   I don't recall.

9      Q.   When you moved to Los Angeles, did you have your own

10   checking account?

11      A.   I don't recall.

12      Q.   Do you recall going out and getting a checking

13   account?

14      A.   I don't remember.

15      Q.   And how long were you in the Poinsettia property?

16      A.   I don't recall.

17      Q.   Do you recall the year that you moved out of the

18   Poinsettia property?

19      A.   I don't recall.

20      Q.   Do you recall if you sold the Poinsettia property to

21   someone?

22      A.   I don't recall.

23      Q.   Do you recall if you hired a real estate agent to sell

24   the property?

25      A.   I don't remember.

Shoshana Klein                                        In re Leslie Klein

1    BY MR. NOLAN:

2        Q.   If you look at the response to Interrogatory No. 4, it

3    says "On August 25, 2006, the debtor Erica Klein, deceased,

4    Nicholas and Leah Stern purchased the Highland property for the

5    responding party."  Do you see that?

6        A.   Yeah.

7        Q.   Okay.  Is that an accurate statement?

8        A.   I don't -- I don't know.

9        Q.   Did your father and mother purchase the 306 North

10   Highland property for you?

11       A.   I know they contributed.  I don't know who purchased

12   it.

13       Q.   And what did they contribute?

14       A.   I don't know.

15       Q.   Did they contribute their time to renovate it?

16       A.   Yes.

17       Q.   Did they contribute money towards it?

18       A.   I think so.

19       Q.   Do you know how much they contributed?

20       A.   I don't.

21       Q.   Do you have any documents to show how much your

22   parents contributed to the 306 North Highland Avenue property?

23       A.   I don't know.

24       Q.   Have you looked for those documents?

25       A.   No.

**Page 81**

Shoshana Klein                                                    In re Leslie Klein

```
 1        Q.    Why not?

 2        A.    I don't know.
```

```
 3        Q.    The next sentence it says, "On August 25, 2006,

 4   responding party transferred the Poinsettia property to the

 5   debtor."  Do you see that?

 6        A.    Yes.

 7        Q.    Do you know who the debtor is?

 8        A.    I don't.

 9        Q.    The debtor is Leslie Klein, your father-in-law;

10   correct?

11        A.    I don't -- I didn't know who the debtor is.
```

```
12        Q.    Yeah, I'm sorry.  The debtor is Leslie Klein.  Do you

13   have any information regarding the transfer of the Poinsettia

14   property to Leslie Klein in or around 2006?

15        A.    I don't.

16        Q.    Do you know if that, in fact, occurred?

17        A.    I don't.

18        Q.    Do you have any information today that you can offer

19   to me to support that the Poinsettia property was ever given to

20   Leslie Klein in 2006?

21        A.    I don't.
```

```
22        Q.    If you look at Interrogatory No. 5 for me.

23   Interrogatory No. 5 says "Identify each year the defendants paid

24   Los Angeles County real property taxes for the Poinsettia

25   property and the amount paid."  And the response is "not
```

1      A.    I don't recall.

2      Q.    Do you recall anyone else coming up to you and saying,

3  congratulations, I'm going to grant deed to you the real

4  property that you were residing in?

5      A.    I don't recall.

6      Q.    Up at the top, it says "This is a bona fide gift and

7  the grantor received nothing in return."  Do you see that?

8      A.    Yes.

9      Q.    Did anyone ever tell you that you were going to be

10  given this property as a gift?

11      A.    I don't recall.

12      Q.    Do you recall any conversation with Mr. Klein where he

13  asked you to purchase the property from him?

14      A.    I don't recall.

15      Q.    Do you ever recall any conversation with Mr. Klein

16  where he talked to you about being in trouble and being in

17  lawsuits?

18      A.    I don't recall.

19      Q.    So this document is dated 2021.  Do you see that?

20      A.    Yes.

21      Q.    In 2020 were you concerned with the property being

22  foreclosed on?

23      A.    Not that I was aware of.

24      Q.    Do you have any recollection as you sit here today of

25  anyone attempting to evict you from the real property in --

1      A.   Not that I'm aware.

2      Q.   -- in 2020?

3      A.   Not that I was aware of.

4      Q.   Okay.  Do you have any recollection as you sit here

5    today in 2021 that anyone was threatening to evict you from your

6    residence on the 306 North Highland?

7      A.   Not that I was aware of.

8      Q.   So as far as your recollection is as you sit here

9    today, in 2020 and 2021, there was no threat that anyone is

10   going to try to take your house away?

11     A.   Not that I was aware of.

12     Q.   Do you recall any mail coming in in 2020 that was,

13   like, official, that, you know, had a markings of, like, a

14   foreclosure, or anything like that?

15     A.   Not that I was aware of.

16     Q.   In 2020 do you recall a process server ever appearing

17   and knocking on the door and trying to serve you or your

18   husband?

19     A.   Not that I was aware of.

20          (Exhibit 9 marked for identification.)

21   BY MR. NOLAN:

22     Q.   This is a thick document.  I apologize.  But I'm just

23   going to ask you to look at the first page, but you can look

24   through the entire thing if you want, but I'm going to identify

25   for the record while you look through it.

Shoshana Klein                                                                                    In re Leslie Klein

1     Q.    And did you get paid for that?

2     A.    For the class?

3     Q.    For teaching at the Yavneh Hebrew Academy?

4     A.    Do I get paid now?  Yeah.

5     Q.    Yeah.  Is it a paid position since 2018?

6     A.    Yeah.

7     Q.    Did you ever become aware of a fallout between your

8     husband and Leslie Klein?

9     A.    Not that I was aware of, a fallout.  A fallout means a

10    fight?

11    Q.    Yeah, like not talking to one another, estranged,

12    things of that nature?

13    A.    Not that I'm aware of.  I don't know how close they

14    are, but it's not -- not a fight.

15    Q.    Okay.  Putting aside how close they are, you're not

16    aware of there ever being a fight where they refused to talk to

17    each other anymore or anything of that nature?

18    A.    Not that I'm aware of.

19    Q.    Okay.  How would you characterize your husband's

20    relationship with Mr. Leslie Klein?

21          MR. ARON:  Objection.  Lacks foundation.

22          You can answer it if you can.

23          And it's vague and ambiguous.

24          But do your best.

25          THE WITNESS:  You mean like good or bad?

Shoshana Klein                                                    In re Leslie Klein

1   BY MR. NOLAN:

2       Q.   I mean how you see it.

3       A.   Not great.

4       Q.   Do you know how often they talk?

5       A.   Not that I'm aware of.

6       Q.   When you say "not that I'm aware of," you're not --

7       A.   I don't hear them talking.  I never heard them

8   talking.

9       Q.   Do I understand you correctly, you're saying you're

10  not privy to how often your husband --

11      A.   Right.

12      Q.   -- communicates with his father?

13      A.   Correct.

14      Q.   And how often do you see Leslie Klein now, 2024?

15      A.   Seeing means like if I see him in a party or --

16      Q.   Yes.

17      A.   -- just go to his house?

18      Q.   See him.

19      A.   In the community, you're saying anywhere?

20      Q.   Yeah.

21      A.   Every few weeks.

22      Q.   So he's still in the same community as you are here as

23  of 2024?

24      A.   Yeah.

25      Q.   How often do you talk to Barbara Klein?

# EXHIBIT B

1           UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               LOS ANGELES DIVISION

4

5     In re                    )
                               )
6     Leslie Klein             ) No:   23-010990-SK
                               )
7               Debtor.        )
                               )
8                              )
                               )
9                              )
      _____)
10

11

12

13

14

15           RULE 2004 EXAMINATION OF

16               KENNETH KLEIN

17           LOS ANGELES, CALIFORNIA

18               MAY 6, 2024

19

20

21

22

23    Reported by:
      Susan Myong
24    CSR 13365

25    Job No. 10139828

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              LOS ANGELES DIVISION

4

5    In re                    )
                              )
6    Leslie Klein             )  No:   2:23-bk-10990-SK
                              )
7              Debtor.        )
                              )
8                             )
                              )
9                             )
                              )
10   _____)

11

12

13

14

15          RULE 2004 EXAMINATION OF KENNETH KLEIN, taken

16   on behalf of Chapter 11 Trustee, at 10100 Santa Monica

17   Boulevard, 13th Floor, Los Angeles, California,

18   beginning at 10:02 a.m., and ending at 3:58 p.m., on

19   Monday, May 6, 2024, before Susan Myong, Certified

20   Shorthand Reporter No. 13365.

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For Bradley D. Sharp, Chapter 11 Trustee:

 4              PACHULSKI STANG ZIEHL & JONES LLP
                BY:   JEFFREY P. NOLAN, ESQ.
 5              10100 Santa Monica Boulevard
                13th Floor
 6              Los Angeles, California 90067
                (310)277-6910
 7              jnolan@pszjlaw.com

 8

 9    For Defendant Kenneth Klein and Shauna Klein:

10              WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN,
                LLP
11              BY:   SIMON ARON, ESQ.
                11400 West Olympic Boulevard
12              9th Floor
                Los Angeles, California 90064-1582
13              (310)478-4100
                saron@wrslawyers.com

14

15    Also Present:   Nicholas R. Troszak, Development
                      Specialists, Inc. (Remote)
16

17

18

19

20

21

22

23

24

25
```

Kenneth Klein                                                      In re Leslie Klein

1     A     Her mother is Leah Stern.

2           MR. ARON:  L-e-a-h.

3   BY MR. NOLAN:

4     Q     And what percentages did the parents put in?

5     A     No idea.

6     Q     You don't know if your dad put in 500 and the

7   Sterns put in 10,000?

8     A     I don't know.

9     Q     That's correct?

10    A     I have no idea.

11    Q     Do you have any understanding if it was

12  proportional?

13    A     I have no idea.

14    Q     Did the Sterns tell you they were looking to

15  buy you a house?

16    A     That question is not technically -- I don't --

17  the answer to that would be no.

18    Q     Was the house a -- well, the house wasn't a

19  wedding present; was it?

20    A     No.

21    Q     Was it any other type of present?  Did you have

22  any children at that time?

23    A     Yeah.  We had two children.

24    Q     So when you moved in at the Poinsettia

25  property, you had two kids?

Kenneth Klein                                                    In re Leslie Klein

1    Q    So did you believe at that time the property

2  was titled in your name?

3    A    I had no -- I didn't think about it, but I had

4  no idea.  I didn't know if it was or wasn't.

5    Q    So they bought you this real property and you

6  didn't have any idea whether or not it was in your name

7  or not.

8    A    Yeah.

9    Q    Did you pay the real property taxes on it?

10    A    No.

11    Q    Did you know that there were real property

12  taxes when you own real property?

13    A    It's a good question.  Back then, I'm not sure.

14  But I don't know.

15    Q    Well, how old were you when you moved in to

16  Poinsettia?

17    A    28?  27, 28.

18    Q    Did you take any insurance out on the property?

19    A    I didn't, no.

20    Q    Do you know if the house had insurance?

21    A    I -- no.  I did not know if it did or didn't.

22  I -- actually, I don't know if we had a renter's

23  property on it or a contents property insurance.  I

24  don't remember if we did or didn't.  It's possible that

25  I had a contents policy on it, but I don't even

Kenneth Klein                                                              In re Leslie Klein

1    And it has a house -- livable room with a bathroom.  So

2    it became, instead of a garage, a back house.

3         Q    So you added a room off the back of the garage?

4         A    Yes.

5         Q    Did you hire the contractors?

6         A    I don't remember.  I believe so, but I don't

7    really remember.

8         Q    Who did you hire?

9         A    My best recollection, his name was Mr. Brief.

10        Q    Can you spell that.

11        A    B-r-i-e-f.

12        Q    And what's his first name?

13        A    I don't remember.

14        Q    You don't remember his first name?  Was he

15   licensed?

16        A    I don't know.

17        Q    Was he bonded?

18        A    I don't know.

19        Q    You don't know whether the people that were

20   coming onto your property to perform construction on it,

21   whether or not they were licensed or bonded?

22        A    I don't remember from 26 years ago.

23        Q    Did you pay for the construction?

24        A    I don't remember.

25        Q    Did you have to sign any paperwork as part of

Page 54

Kenneth Klein                                                    In re Leslie Klein

```
 1        A    Correct.

 2        Q    Did you know title was taken in Bay Area

 3   Development Company?

 4        A    No.

 5        Q    Did this deed of trust ever show up at the

 6   house?

 7        A    No.

 8        Q    So at the time you resided at 161 North

 9   Poinsettia Place, you never received any documents

10   memorializing this transaction?

11        A    No.

12        Q    Did you negotiate at all with the Colmans for

13   the purchase of the property?

14        A    No.

15        Q    What did your wife's parents tell you, if

16   anything, about acquiring the 161 North Poinsettia Place

17   property?

18        A    I don't remember if they said anything about

19   acquiring the property.

20        Q    Okay.  What about your dad?  What did your dad

21   tell you about acquiring the 161 North Poinsettia Place

22   property?

23        A    That him and my in-laws are together buying

24   this property on our behalf.

25        Q    Is -- do your -- strike that.
```

Page 59

Kenneth Klein                                                    In re Leslie Klein

```
1      A    Minor.

2      Q    Like, how much is "minor"?

3      A    I don't remember.

4      Q    More than 100,000?

5      A    No, no, no.

6      Q    Less than 100,000?

7      A    Yes.  Yes.

8      Q    Did you apply for any mortgages --

9      A    No.

10     Q    -- at this time?

11     A    No.

12     Q    So you never walked into a bank or even tried

13   to see whether or not you were credit worthy?

14     A    Right.

15     Q    Did you own your own cars?

16     A    Leased.

17     Q    But were the cars in your name?

18     A    I don't remember.

19     Q    You don't remember whether or not the cars were

20   in your own name in September of 2007?

21     A    No, I don't.

22     Q    As part of being -- working for the Law Offices

23   of Les Klein & Associates, was one of the perks that

24   they leased a car for you?

25     A    I don't remember.  It's possible.
```

Page 70

1        A      No.

2        Q      So, Mr. Klein, it's your contention that you

3   were the owner of the 161 North Poinsettia property when

4   you were residing in it?

5        A      Yes.

6        Q      And why is that?

7        A      Because my father and in-laws bought the house

8   for us.

9        Q      And how do you know they bought the property

10  for you?

11       A      They told us.  My in-laws aren't going to pay

12  money to buy the house for my father.

13       Q      Well, where did they deposit the funds that

14  your in-laws contributed?

15       A      I have no idea.

16       Q      So you don't know if they contributed them

17  directly to your dad and he did something else with them

18  or if they put it into escrow?

19       A      They bought the house for me and my wife.  My

20  father-in-law -- repeat that again, when he said, "It's

21  your house and you can take a mortgage on it."

22       Q      Right.

23              But as far as where -- whatever amount of money

24  your in-laws contributed, you don't know where they

25  deposited that money.

Kenneth Klein                                                                    In re Leslie Klein

```
 1        A     No idea.

 2        Q     And you don't know whether or not there was

 3    even an escrow for the acquisition of the 161 North

 4    Poinsettia property.

 5        A     No idea.

 6        Q     And what documents do you rely on -- or strike

 7    that.

 8              So you've been kind enough to tell me that your

 9    parents told you it was their house -- your house?

10        A     Yes.

11        Q     What documents do you have or are you aware of

12    that would evidence that it was your house?  That being

13    the 161 North Poinsettia property.

14        A     I don't have any documents.

15        Q     Like, did your dad come in and hand you a

16    contract and say, "Congratulations, son.  This is your

17    house"?

18        A     No.

19        Q     Did he give you any type of trust agreement or

20    anything that said, "This is your house"?

21        A     No.

22        Q     And is it fair to say that as you sit here

23    today, you're not familiar with any document that would

24    indicate that the 161 North Poinsettia property was your

25    house.
```

**Page 75**

Kenneth Klein                                                    In re Leslie Klein

1        A       Correct.

2        Q       And I'm accurate when I say you never paid rent

3    at the 161 North Poinsettia property.

4        A       Yes.

5        Q       And if you were going to pay rent, who would

6    you have paid it to?  Who was your understanding --

7    strike that.  Poor question.

8                Who was your -- who, in your opinion, owned

9    legal title to 161 North Poinsettia when you were

10   residing there?

11       A       It was our house.

12       Q       No.  My question is a little different.

13               When you were residing in the house, who did

14   you believe was -- owned legal title to 161 North

15   Poinsettia?

16       A       I didn't think about who owned legal title when

17   I lived there.

18       Q       Well, did you think you were free to convey

19   161 North Poinsettia to anyone?

20       A       If -- it's a moot question.  It wasn't a

21   question of whether -- who did or not.  I didn't think

22   about it.

23       Q       So while you resided at the North Poinsettia

24   property, you never thought about conveying or that you

25   would have to be on title to own it?

Page 76

1     appreciate in value?

2         A     Yes.

3         Q     How do you know that?

4         A     I was -- the real estate market.

5         Q     So you kept up on the real estate market?

6         A     As far as real estate market in the

7     neighborhood, yes.

8         Q     All right.  So back in 2000, 2002, 2004, you

9     were aware that real estate was appreciating in your

10    neighborhood?

11        A     Yes.

12        Q     Do you know how much it was appreciating?

13        A     At what point?

14        Q     At any point.

15        A     I knew, yes.

16        Q     So you're there for almost ten years?

17        A     Yes.

18        Q     And how much did you think it had appreciated?

19        A     By the time we moved out, I was told that it's

20    worth close to 1.3.

21        Q     And who told you that?

22        A     I don't remember.

23        Q     Well, how did you come to the understanding

24    that the property was worth 1.3 million when you exited

25    it in 2006?

Kenneth Klein                                              In re Leslie Klein

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And that took place in September 2006? |
| 3 | A | Okay. |
| 4 | Q | Yes? |
| 5 | A | Yes. |
| 6 | Q | Okay.  So there's a change in ownership; right? |
| 7 | A | Not on deed. |
| 8 | Q | Did you execute a grant deed? |
| 9 | A | No. |
| 10 | Q | So you think since you didn't execute a grant |
| 11 | | deed, there was no taxable event? |
| 12 | A | I have no idea. |
| 13 | Q | Well, your testimony is you gave up beneficial |
| 14 | | ownership of 161 North Poinsettia; right? |
| 15 | A | Yes. |
| 16 | Q | And did you give it to your father or did you |
| 17 | | give it to Bay Area Development Company? |
| 18 | A | I didn't formally give it to anybody. |
| 19 | Q | Did you execute any type of document? |
| 20 | A | No. |
| 21 | Q | Did you give your dad a handshake? |
| 22 | A | Not that I remember. |
| 23 | Q | So when you moved in to 306 North Highland, did |
| 24 | | you do any type of renovations or improvement? |
| 25 | A | Yes. |

Kenneth Klein                                                          In re Leslie Klein

1      A      I was actually named in the lawsuit.  I

2    don't -- if I would lose -- if I would lose the lawsuit,

3    they would take it away from me also.

4      Q      Right.  If either one of you lost the lawsuit.

5      A      Yeah.  That wouldn't be the reason to take it

6    out of my father's name and put it into my name.  I just

7    wanted it to be in my name.

8      Q      Okay.  Well, what was it about the Vago lawsuit

9    that made you think that the property needed to be --

10   legal title needed to be in your name?

11     A      I just wanted it to be separated from my

12   father.  I wanted to do my own thing.  I don't want to

13   be connected with any of that.

14     Q      Were you aware of any other lawsuits that were

15   pending against your father?

16     A      The only other one I was aware of was -- and

17   not with the particulars, was Menlo.

18     Q      What was your understanding of what the dispute

19   was in the Menlo case?

20     A      I don't know.

21     Q      Do you -- you knew about the Menlo -- strike

22   that.

23            Did you know about the Menlo litigation when

24   you were a lawyer at the Law Offices of Les Klein &

25   Associates?